[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. The Dissolution of the Marriage CT Page 8602
This court finds that all of the allegations of plaintiff's complaint have been proven, that the marriage has broken down irretrievably, and the marriage is ordered dissolved for that reason.
II. The Gross Marital Estate of the Parties
Plaintiff
#4 Fairview Avenue Value $300,000 New Hartford, CT — Mortgage 189,479 ------- Total equity $110,521 interest $55,260 $55,260 Household furniture — 2 Kayaks 600 Bank Accounts 10 Life Insurance (C.S.U.) — Tesip 29,835 Kemper I.R.A. 7,953 1984 Ford Truck 1,500 1983 B.M.W. Motorcycle 2,000 ------ $97,158
Defendant
1/2 equity in family home $55,261 1987 Saab 4,000 Household furniture — Bank Accounts 500 Stock — Orion Group 60 I.R.A. 8,596 I.R.A. 2,455 Pension-cash balance 18,729 ------ $89,601
Total Gross Marital Estate $186,759
III. The Calculation of Credits Due to the Parties
In 1976, nine years prior to her marriage to plaintiff, defendant purchased a home for $39,000. At the time of her marriage to plaintiff in 1985 she estimated the value of that property to be between $150,000 CT Page 8603 and $160,000. In 1987 she sold her home for $174,000 and expended the net proceeds of the sale, i.e. $138,000, as a partial payment toward a new home she and plaintiff purchased for $375,000. Defendant at that time also contributed $34,000 from a Travelers account, $29,000 of which he had already saved when the parties married. The following analysis of these transactions is made in order to determine the "pre-marital" credits to which each party is entitled:
A. Defendant's Credit
Purchase price of Defendant's first home in 1976 $ 39,000 Value on April 25, 1985 (mean of two estimates) $156,000 Sale Price — 1987 $174,000
Total Gain $135,000 Gain from 1985 to 1987 (while parties were married) 19,000 % of gain during marriage 14% Gain from 1976 to 1985 (date of marriage) $116,000 % of gain while defendant was unmarried 86% Net proceeds of sale (all of which went toward new home) $138,000 % realized while parties were married 19,320 (14% X $138,000) % realized while defendant was unmarried-Defendant's credit $118,680
B. Plaintiff's Credit
Amount contributed by plaintiff toward purchase of new home from Tesip $ 34,000 Amount in Tesip account on date of marriage $ 29,000 Credit due Plaintiff $ 29,000
There was some evidence of an impersuasive nature of possible other "pre marital" contributions made by plaintiff but, on the evidence, this court finds that the total credit due plaintiff is $29,000.
Recapitulating Plaintiff's credit $118,680 Less defendant's credit — 29,000 ------- CT Page 8604 Net Credit due defendant $ 89,680
IV. The Adjusted Gross Marital Estate of the Parties
Plaintiff
Total equity in #4 Fairview Avenue New Hartford, CT as per Article II $110,521 Less credit to defendant — $89,680 ------- Total Equity after credit $20,841 1/2 interest of plaintiff $10,420 Household furniture — 2 Kayaks 600 Bank Accounts 10 Life Insurance (C.S.U.) Tesip 29,835 Kemper I.R.A. 7,953 1984 Ford Truck 1,500 1983 B.M.W. Motorcycle 2,000 ------ TOTAL $52,318
Defendant
1/2 adjusted equity in family home $10,421 1987 Saab 4,000 Household furniture — Bank Accounts 500 Stock — Orion Group 60 I.R.A. 8,596 I.R.A. 2,455 Pension-cash balance 18,729 ------ TOTAL $44,761
Total Adjusted Gross Marital Estate $97,079
V. The Examination of the Evidence as it Pertains to Sec. 46b-81c C.G.S
The plaintiff husband and the defendant wife were married April 25, 1985, eight years ago. The parties had first met in April, 1983 and after a courtship of 6 months plaintiff "moved in" with defendant in a home she owned at the time. Plaintiff CT Page 8605 was separated from his wife when the parties first met and was divorced one year later. Plaintiff is a recovered alcoholic whose last drink was May 6, 1984, and he is a member in good standing of Alcoholics Anonymous.
Plaintiff, who is 47 years old, and defendant, who is 43, have one child, an adopted daughter, Jesse, born in Peru on October 10, 1989 and now 4 years old.
Plaintiff received an AA degree from Mitchell College and thereafter attended C.W. Post College for one year, spent 4 years in the Air Force and after that graduated from Texas Tech with a B.S. degree. He has been employed as a statistical analyst at Travelers Insurance Company for almost 20 years. He presently earns a gross weekly income of $955 from his employment with a net after the usual deductions of $764.
Defendant received a B.S. degree in education from Central Connecticut State College, and for almost 5 years has been employed as a supervising market analyst at Travelers Insurance Company. Previously she had worked at Security Insurance Co. for 13 years as an underwriting supervisor. She presently has a gross weekly income of $923 with a net after the usual deductions of $740. She also receives $144 weekly in rental income.
Both parties are in apparent good health.
Plaintiff has since September, 1991, 2 months prior to the commencement of this action been sexually involved with one Karen Fonteyne. This relationship has been devastating to defendant and is a significant reason for the bitterness which has existed between the parties. This fact is mentioned at this time so that the remarks of Dr. Rolson in a subsequent paragraph may be better understood.
Fault
Much of the turmoil present in this marriage involves disputes arising from the varying viewpoints of the parties regarding the care and general upbringing of their daughter.
Dr. Kenneth Rolson, an extremely well qualified child psychologist who had been retained by both parties to conduct CT Page 8606 a custody study concerning their minor child, Jesse, made the following observations concerning the child and her parents: Re Jesse: (Age 4) (Attends a day care center 5 days a week while the parties work). "Jesse has psychological and developmental problems. She is slow in language development and figure drawing. Her most recent picture drawing indicated she was immature for her age. Her emotional problems are primarily a result of the conflicts of the parties which are chronic and intermittent. Jesse has other problems that make this worse. She has a condition known as PICA resulting in the eating of inanimate objects from the floor. She related too easily to me, has already expressed some degree of promiscuity and in the past would walk off with anyone who came into the house." Dr. Rolson noted that between October 1992 when he made his lengthy report on the question of custody and August 1993 when he most recently saw Jesse her speech was improved but her capacity to draw the human figure was impaired. She was more resistant to complying with requests from those in authority and was more indiscriminate with adults, which Dr. Rolson described as "alarming." He noted that "development requires silence and peace, but the tension level between the parties has been explosive."
Dr. Rolson observations relating to the parties are high lighted as follows:
"The defendant was injured terribly by plaintiff's decision to divorce and by his new relationship. In general he has been respectful of her qualities as a parent. I think they are both loving and concerned. I think the problem we are discussing is serious and makes (defendant) blind to the child's needs. I'm also concerned with defendant's anxiety and control problems. I'm not sure if parent counselling would be helpful — counsellors can't change something that people don't want to change.
Concerning Jesse and Karen Fonteyne, Dr. Rolson stated the following "She (defendant) was concerned that Jesse take on a new relationship — this was natural. But she (Defendant) also has a sense of injury. Jesse will sometimes call Karen mother. Its a matter of discrimination. I see no problem with Jesse's contact with Karen Fonteyne as time goes on. Dr. Rolson did not interview Karen Fonteyne.
In conclusion Dr. Rolson summarized the conflict between CT Page 8607 the parties as follows "it's a bad mix. He doesn't like to be controlled. She might appear to be controlling. The problem is in fact their personalities. He has a greater capacity to listen — is less rigid." Dr. Rolson also noted that plaintiff did not show good judgment in taking 2 1/2 year old Jesse kayaking on the Farmington River without a life preserver.
Fault as viewed by plaintiff
Plaintiff's testimony suggests that the marriage began to disintegrate in late 1989 — early 1990 when the parties were in the process of commuting to Peru as part of the adoption process for Jesse. As plaintiff stated "I was not aware of problems with (the defendant) at that time. There was a noticeable difference when she returned from Peru with Jesse. I noticed a slow and progressive pattern of her giving more time to Jesse and less to me. She was slowly easing Jesse out of my life. What I saw was not a healthy situation. I would not be included in Jesse's life. I felt like a fixture in the home. I was slowly phased out." By the summer of 1991 plaintiff describe the marital atmosphere as "unhealthy." In August, 1991 plaintiff described the marriage as "doomed," that there was "no common ground to share, no real communication." After plaintiff instituted the present action, he described the atmosphere in the household as "open warfare — it was as if she wanted to eliminate me from the house — she was playing a dangerous psychological game with me."
Concerning Karen Fonteyne he stated "Our relationship began in late August, 1991 and we (became intimate) on September 6, 1991 — my marriage had broken down at that time"
Plaintiff left the marital home in April, 1992.
Fault as viewed by defendant
The testimony of defendant focused for the most part on plaintiff's lack of good judgment in his relationship with their daughter and on her utter devastation upon learning of plaintiff's relationship with Karen Fonteyne. She cited the following instances of what she considered poor judgment: 1) permitting Jesse to go down a slide head first when she was 21 months old. 2) Throwing Jesse up in the air and catching her when she was 12-14 months old. 2)[3] Taking Jesse kayaking in CT Page 8608 the Farmington River without a life preserver. 4) Sharing a shower with Jesse and defending his actions by saying "I'm not afraid of my nudity." Defendant's conclusion on this subject expressed her concern for the future: "I don't think you can learn good judgment."
On another subject, she expressed her disappointment when plaintiff returned from Peru in 1989 with Christmas presents for every member of the family but her.
On the reasons for the breakdown of the marriage she stated "I think something happened to (plaintiff) in Peru. He changed." She added that "I'm not saying that I'm totally blameless insofar as the breakdown is concerned."
After considering all of the evidence this court concludes that responsibility for the breakdown of the marriage lies for the most part with plaintiff.
The parties have contributed equally in the acquisition, preservation, or appreciation in value of their respective estates and have identical opportunities for the future acquisition of capital assets and income.
After reviewing and weighing all of the evidence as it pertains to the manner in which the marital estate of the parties should be distributed it is concluded that the estate should be divided as follows
 Plaintiff 47% Defendant 53%
The Distribution of the Marital Estate of the Parties
Plaintiff 47% $45,627
2 Kayaks $ 600 Bank Accounts 10 Life Insurance (C.S.U.) — Tesip 29,835 Kemper I.R.A. 7,953 1984 Ford Truck 1,500 1983 B.M.W. Motorcycle 2,000 Amount due from defendant-lump sum alimony 3,729 ----- CT Page 8609 TOTAL $ 45,627
Defendant 53% $51,452
Total adjusted equity in family home $ 20,841 1987 Saab 4,000 Household furniture — Bank Accounts 500 Stock — Orion Group 60 I.R.A. 8,596 I.R.A. 2,455 Pension-cash balance 18,729 ------ TOTAL $ 55,181 Less amount due plaintiff — 3,729 ------ Balance due defendant $ 51,452
VI. Orders Relating to the Distribution of the Marital Estate
A. Plaintiff shall quit claim his interest in No. 4 Fairview Avenue, New Hartford, CT to defendant. Simultaneous therewith defendant shall pay plaintiff the sum of $3,729. This transaction shall take place within 60 days from date hereof.
B. Defendant shall hold plaintiff harmless concerning any mortgages or other encumbrances on said property.
C. The parties shall execute all documents necessary to carry out this and any other order of this court.
VII. Alimony
After considering all of the evidence as it pertains to Sec. 46b-82 C.G.S. this court makes no award of alimony to either party.
VIII. Orders pertaining to the minor child
In making the following orders concerning custody, visitation and related subjects, the court is accepting and following the recommendation of both Kenneth S. Rolson, M.D. an eminently well qualified child and adolescent psychologist who was retained by both parties to conduct a custody study, CT Page 8610 and Lynne Ustach, the court appointed attorney for the minor child.
A. Custody/visitation
1. The parties shall share joint legal custody of the minor child Jesse with each parent participating in the primary physical care and control of the child. The shared parenting shall include the child being with her father as follows.
(a) Alternating weekends from Thursday at 3:00 p.m. to Monday at 8:00 a.m. or an earlier hour appropriate to Jesse's return to the childcare or school program where she is enrolled.
(b) Tuesdays and Thursdays from 3:00 p.m. or after her school program to 7:00 p.m.
(c) On the weeks when paternal weekend visitation does not take place, the Thursday visitation will begin at 3:00 p.m. and continue until Friday at 8:00 p.m. or an earlier hour appropriate to the return of Jesse to her childcare or school program. Within three months of the commencement of parent and child therapy, unless clearly contraindicated by the therapist/clinician, paternal visitation on the alternating weeks when weekend visitation does not take place, will commence on Tuesday afternoon at 3:00 p.m. and end Friday at 8:00 a.m. or an earlier hour returning Jesse to her childcare or school program.
(d) The major holidays will be spent with each parent on an alternate-year basis. In order to maximize stable blocks of time with each parent, the traditional three-day weekends (Memorial Day, July 4th, Labor Day, and Columbus Day) should alternate each year so that each parent has at least two of these long weekends with Jesse. Christmas Eve and Christmas, and the first half of the Christmas week, will be spent by Jesse on an alternating basis with each parent, as will New Year's Eve, New Year's Day, and the latter half of the Christmas week. Jesse will spend Thanksgiving Day and the following Friday on an alternating-year basis with the parent who does not have Christmas Eve and Christmas Day of that same year. Easter Sunday and the first half of Easter CT Page 8611 Week, when school vacations commence, will be spent on an alternating-year basis with each parent, as will the latter half of that week with the opposite parent.
B. Counselling
The parties shall immediately commence counselling with a single therapist either jointly or in separate (initially preferable) meetings. Individual therapy for Jesse shall commence at the same time, preferably with the same clinician meeting with the parents. Dr. Harriet Wetstone and her colleagues are prepared to provide such treatment for both Jesse and the parties.
C. Review of Jesse's status
The status of Jessie shall be reviewed at six month intervals over the next year, beginning no later than January 1, 1994 to determine whether any continuing parental conflict requires a modification of her custodial status.
D. Other Orders
1. The parties shall mediate any and all disputes regarding visitation, custody and the care and maintenance of the child.
2. The parties shall share and exchange any and all information regarding the child's medical care, school activities and extracurricular activities. Report cards, school calendars and other schedules of any school or other activity regarding the minor child shall be exchanged between the parties within three (3) calendar days. In non-emergency situations, each party shall notify the other of any activity within one (1) week. In any emergency situations, each party shall notify the other within five (5) hours.
3. The parties shall jointly select any physicians, counselors, or other health professionals who shall render services on behalf of the minor child.
4. The parties shall at all times exchange their phone numbers and addresses with the other party and shall give thirty (30) days notice of any planned change of residence.
E. Support CT Page 8612
In view of the previous orders concerning custody and visitation, no order of support is made at this time. The parties shall share equally the cost of day care for the minor child.
F. Health Insurance
Plaintiff shall maintain health insurance for the minor child. The parties shall share equally this cost as well as costs for all unreimbursed medical, dental, orthodontic, ophthalmological, psychological and pharmaceutical expenses. The provisions of Sec. 46b-84c shall apply.
G. Life Insurance
The parties shall during her minority maintain their existing life insurance policies with Jesse as beneficiary.
H. Counsel Fees
The parties shall share equally all counsel fees due to Lynne A. Ustach, attorney for the minor child.
IX. Personal Property
This court adopts the recommendation of Lynne A. Ustach, attorney for the minor child, concerning the distribution of disputed items of personal property and in accordance therewith issues the following orders:
1. In addition to the personal property previously removed from the marital residence, the Plaintiff shall be entitled to the snow blower, the wardrobe, the long hall table, the pink chest in the kitchen, and the hall tree.
2. The Defendant shall be entitled to the remaining personal property located in the marital residence plus the Bobcat mower, two wood stoves, the brass bed, the Victorian lamp, and the oriental rug referenced in the Defendant's proposal. In addition thereto, the Defendant shall be entitled to all maps and surveys relating to the jointly owned residence, her father's tools, a reasonable amount of the jointly owned and acquired tools, a bird carving from her brother (if it exists), one-half of all photographs of the CT Page 8613 minor child and the parties' trip to Peru, and the lace tablecloth gifted by her mother.
X. Other Orders
A. Change of Name
As requested in her cross complaint, defendant's former name of Judyth A. Hein is ordered restored to her.
B. Counsel Fees
No award of counsel fees is made to either party.
C. Liabilities
Each party shall be solely responsible for all liabilities shown in his or her personal affidavit and shall hold the other party harmless in that regard, except that the parties shall share equally any amount due to Dr. Kenneth Rolson.
D. Health and Life Insurance for the Parties
No order is made by the court in this regard.
E. Tax Exemption
The parties shall alternate taking the minor child as an exemption in their federal and state income tax returns with defendant having the exemption for the odd numbered tax years, commencing in 1993 and plaintiff for the even numbered tax years, beginning in 1994.
John D. Brennan State Trial Referee